[No. 18068. In Bank.—April 25, 1894.]

# W. F. SAWYER, APPELLANT, v. EDWARD P. COLGAN, CONTROLLER, ETC., RESPONDENT.

CONTROLLER OF STATE—PAYMENT OF CLAIMS—BONDS AND COUPONS—BOARD OF EXAMINERS.—The controller of state is not prohibited by the provisions of section 672 of the Political Code from drawing his warrant to pay bonds and coupons issued by the state, without approval by the state board of examiners, but such bonds and coupons have the force of audited claims, and are not required to be approved by that board.

ID.—CONDITIONAL APPROPRIATION BY STATE—INDIAN WAR BONDS—APPROPRIATION BY CONGRESS.—The liability of the state upon the bonds provided for as a war fund for the suppression of Indian hostilities by the act of May 3, 1852, was conditioned upon the failure of Congress to make an appropriation to pay them; and Congress having provided an appropriation to pay these bonds upon reasonable conditions, consisting of such precautionary measures against imposition and fraud, as it had a right to take, the condition upon which the state was to be liable has not arisen, and the controller cannot be compelled to pay any bonds or coupons issued under said act.

ID.—SUFFICIENCY OF APPROPRIATION BY CONGRESS—LIABILITY OF STATE. Even if the appropriation by Congress was insufficient to pay all the outstanding bonds and coupons provided for by the act of 1852, the state is not liable for the payment of any such bonds or coupons as would have been paid if they had been' presented under the act of Congress at the proper time.

ID.—ERRONEOUS RULINGS OF GOVERNMENT OFFICERS—STATE NOT RESPONSIBLE.—If any of the bonds were not paid by reason of erroneous rulings on the part of the officers of the departments of the general government, such result is not due to the failure of the state or its officers, which have a right to rely upon the acts of Congress, and the state is not thereby rendered responsible for the payment of such bonds.

ID.—BONDS UNDER ACT OF 1851—LIABILITY OF STATE—MANDAMUS—STATUTE OF LIMITATIONS.—The state is liable for the payment of bonds and coupons issued under the act of February 15, 1851, and as no provision

was made by the state for the payment of these bonds or coupons until the year 1889, the statute of limitations did not begin to run against the bonds or coupons until that time, and the controller may be compelled by *mandamus* to pay coupons issued under that act not barred by the statute.

ID.—MATURITY OF BONDS AND COUPONS.—The bonds provided for by the act of 1851 were not to mature until the expiration of ten years, or at the option of the state, after five years, and it was intended that the obligation provided for by the act should be payable out of the money which should at their maturity or thereafter be found in the state treasury, and which at the time it reached the treasury had not been appropriated to some other purpose.

ID.—PAYMENT OUT OF PARTICULAR FUND—STATUTE OF LIMITATIONS.—It is a general rule that when payment is provided for out of a particular fund, or in a particular way, the debtor cannot plead the statute of limitations without showing that the particular fund has been provided or the method pursued.

ID.—COUPONS UNPROVIDED FOR—STATUTE OF LIMITATIONS.—Where the payment of coupons for interest upon bonds must have been refused on the ground that no funds are provided for their payment, the statute of limitations will not run against them until such funds are provided.

ID.—ACTION AGAINST STATE—TAXING POWER.—A debtor cannot sue the state when there is no act authorizing him to do so, and his only remedy in such case lies in the voluntary exercise of the taxing power of the state.

ID.—INTEREST ON MATURED INDEBTEDNESS.—The state is not liable to pay interest on its matured indebtedness, unless its consent to do so has been manifested by an act of the legislature, or some lawful contract of its executive officers.

ID.—MANDAMUS AGAINST CONTROLLER—AUTHORITY OF LAW.—In *mandamus* the controller can be required to draw his warrant only for what is expressly authorized by the statute.

APPEAL from a judgment of the Superior Court of Sacramento County.

The facts are stated in the opinion of the court.

*W. C. Belcher*, and *George E. Bates*, for Appellant.

*Barham & Bolton*, and *Attorney General W. H. H. Hart*, for Respondent.

PATERSON, J.—The appellant applied to the court below for a writ of mandate, commanding the respondent, as controller of the state, to issue a warrant upon the state treasury for the amount claimed to be due on a certain bond and on certain coupons. Judgment was

entered denying the prayer of the petitioner, and from that judgment he has appealed to this court.

The bond mentioned was issued July 15, 1854, under an act approved May 3, 1852 (Stats. 1852, p. 59), authorizing the state treasurer to issue bonds to an amount not exceeding six hundred thousand dollars for the payment of expenses of certain expeditions against the Indians. Bonds to the full amount authorized by the act were issued, and made payable May 2, 1862, with annual interest coupons attached. It was stipulated in the bonds that they should be payable at the office of the state treasurer, " provided the same be not sooner paid from funds anticipated in said act to be derived from the government of the United States, with interest at the rate of seven per cent per annum, payable at the state treasurer's office on the surrender of the annexed coupons on the first day of January, A. D. 1853, and annually thereafter." Some of the coupons presented were attached to this bond; others were detached from other bonds issued under the same act, and the remainder were detached from bonds issued under the act of February 15, 1851, hereinafter referred to.

It is claimed by the respondent that the bonds and coupons are not audited claims, and that the controller, by the provisions of section 672 of the Political Code, is prohibited from drawing his warrant for such claim until it has been approved by the state board of examiners; but, after careful consideration of all the provisions of the code and the decisions bearing upon the subject, we are satisfied that the point is not well taken. (*Meyer* v. *Porter*, 65 Cal. 67; *Freehill* v. *Chamberlain*, 65 Cal. 603.)

Section 1 of the act of 1852 (Statutes of 1852, page 59), reads as follows: " SECTION 1. A sum not exceeding six hundred thousand dollars is hereby appropriated and set apart as an additional war fund, payable in ten years out of any money which may be appropriated by Congress to defray the expenses incurred by the state of California, and interest thereon at the rate

of seven per cent per annum, in the suppression of Indian hostilities, or out of the proceeds of the sale of any public lands which may be donated or set aside by Congress for that purpose; and should no such appropriation or donation be made, or if an amount sufficient should not be appropriated or donated within the said ten years, then the bonds authorized to be issued by this act shall be good and valid claims against the state, and shall be paid out of any moneys in the treasury not otherwise appropriated to pay the expenses of the expeditions mentioned in this act."

We think it is clear that the liability of the state upon the bonds thus provided for was conditional; they were conditioned upon the failure of Congress to make an appropriation to pay them. Upon the failure of Congress to do so, and not before, were they to become good and valid claims against the state. They were to be paid within ten years; and if Congress within that time made no appropriation to pay them, they were to be paid out of money in the state treasury not otherwise appropriated. Congress did make an appropriation to pay these bonds. Section 9 of the act of Congress of August 5, 1854, provided as follows: "Sec. 9. And it is further enacted that the secretary of war be, and he is hereby, authorized and directed to examine into and ascertain the amount of expenses incurred and now actually paid by the state of California in the suppression of Indian hostilities within the said state prior to the first day of January, A. D. 1854, and that the amount of such expenses when so ascertained, be paid into the treasury of said state; provided, that the sum so paid shall not exceed in amount the sum of nine hundred and twenty-four thousand two hundred and fifty-nine dollars and sixty-five cents; which amount is hereby appropriated out of any money in the treasury not otherwise appropriated."

But it is said that subsequent acts of Congress imposed conditions which were not in any way binding on the bondholders, and that in any event the condition

was not complied with until the funds provided by the act of Congress were paid into the state treasury.

Neither of these contentions we think is sound. Section 8 of the act of Congress passed August 15, 1856, provides: "That the secretary of war is hereby authorized and directed to pay to the holders of war bonds of the state of California the amount of money appropriated by act of Congress, approved May (August) 1854, in payment of expenses incurred and now actually paid by said state of California for the suppression of Indian hostilities within the said state prior to the first day of January, A. D. 1854, under the following restrictions and regulations: Before any bonds shall be redeemed by the secretary of war they shall be presented to the board of commissioners appointed by the legislature of said state by an act approved April 19, 1856, and the amount due and payable on each bond be indorsed thereon by said commissioners. Upon presentation to the secretary of war of any bond or bonds thus indorsed it shall be his duty to draw his warrant in favor of the holder or holders thereof for the amount certified to be due upon the same by said commissioners, upon the secretary of the treasury, who is hereby directed to pay the same; provided, that said amounts in the aggregate shall not exceed the amount of money appropriated by the act of Congress approved August 5, 1854. Said bonds, after redemption, and after taking off the coupons that remain unpaid, shall be delivered to the secretary of war to be canceled."

The conditions therein provided were not unreasonable, but were merely such precautionary measures against imposition and fraud as Congress had a right to take. The act of May 3, 1852, contemplated action on the part of Congress, and the bondholders must have known when they accepted the bond that if Congress made an appropriation to pay it, some safeguard would be provided to prevent fraud and imposition. Furthermore, by an act passed June 23, 1860 (12 U. S. Stats., p. 104, sec. 4), Congress provided as follows:

" That the secretary of war be and he is hereby authorized to pay out of the unexpended balance of appropriation *for the war debt of the state of California,* made by the last section of the act approved August 5, 1854, entitled 'An act making appropriation for the support of the army for the year ending the 30th of June, 1855,' any outstanding and unpaid bonds and coupons issued by said state for said war debt prior to the passage of said act, but bearing date subsequent to the first day of January, 1854; provided that no payment shall be made beyond the unexpended balance of said appropriation now remaining in the treasury." This act was passed about two years prior to the maturity of the bond in suit. There is no additional condition imposed therein, and we are unable to see why the amount of petitioner's bond and coupons could not have been collected out of this unexpended balance. It is not sufficient answer to say that this balance was insufficient to pay *all the outstanding bonds and coupons;* it is enough to know that petitioner's bonds and coupons would have been paid if they had been presented at the proper time. Prior to the passage of this last act referred to there had been presented and paid by the United States, bonds and coupons amounting to the sum of $914,071.02. Again, on July 25, 1868, Congress passed an act (15 U. S. Stats. 175) " To reappropriate an unexpended balance of an appropriation made by an act approved August 5, 1854, to refund to the state of California expenses incurred in suppressing Indian hostilities, said balance having lapsed and been covered into the treasury on the thirtieth day of June, 1863, $10,183.63; provided that nothing shall be paid except subject to existing provisions of law, and upon the finding and certificate of the third auditor that the same is actually due." From June 23, 1860, therefore, down to the time the unexpended balance lapsed into the treasury this amount, $10,183.63, was in the treasury, and applicable to the payment of bond 420, and the coupons mentioned in section 4 of the act. Eight years later

that amount was reappropriated. (See, also, 21 U. S. Stats. 510.) Bond No. 420 was dated July 15, 1854. The coupons taken from said bond, and others issued under the act of May 3, 1852, were all for interest, which became due at least a year subsequent to January 1, 1854. If any of these obligations were not paid by reason of erroneous rulings on the part of the officers of the departments, it is sufficient to say that the result is not due to any fault of the state or its officers. The latter have a right to rely upon the acts of Congress. The condition upon which the state was to be liable has not arisen. The act of 1852 did not stipulate that the bonds would be paid by the state if the money appropriated by Congress was not paid into the state treasury. The construction contended for is too strict. The act appropriates such moneys as Congress may appropriate to defray the expenses incurred, without stating the manner of appropriation which might be adopted by Congress. The state acquiesced in the action of Congress, and recognized the propriety of the method chosen for the payment of the claims by appointing commissioners to represent the state, and exhibit the vouchers required. It cannot be claimed in reason that Congress, with the duty resting upon it to pay the expenses, had not the right to scrutinize the claim, and to take reasonable precautions against the fraudulent demands. The bond on its face provides for payment by the state, "provided the same be not sooner paid from funds anticipated in said act, to be derived from the government of the United States." It was understood that Congress might pay the money over to the state, and in that event the bonds would be payable at the office of the state treasurer; but it was not unreasonable to suppose, and such was anticipated doubtless, that the demands should be made payable by Congress at the national treasury. It was the duty of the general government under the constitution to defend the states from invasion or insurrection; and when the state of California found it necessary to raise funds

in order to defend itself, the general government became in duty bound to reimburse the state for the cost of such defense. The state, however, recognized its obligation to pay those who had enlisted in her defense, if the general goverment failed to discharge its obligation to the state. Therefore, it was provided that if Congress did not, within ten years, make provision for the payment of the bonds, the state would pay them.

Our conclusion is that the state of California never became liable to pay bond 420, or its coupons, or any of the coupons in suit of the bonds issued under the act of 1852.

The question as to the liability of the state upon the coupons of bonds issued under the act of 1851 is not so clear. Sections 1 and 7 of that act read as follows:

" SECTION 1. By virtue of the power given to the legislature by the constitution of this state—article VIII, ' in case of war to repel invasion or suppress insurrection ' —a loan, not exceeding five hundred thousand dollars, is hereby authorized to be negotiated upon the faith and credit of the state, payable in ten years, and at any period after five years, at the pleasure of the state; said loan to pay a rate of interest not exceeding twelve per cent per annum, payable annually or semi-annually, at such place as the contracting parties may agree; provided, however, that the interest of the first year may be paid in advance out of the loan thus made."

" SEC. 7. Any claim which this state has now, or may hereafter have, upon the general government for moneys expended out of this loan, for the purposes aforesaid, shall be, and the same is hereby, set apart and pledged for the payment of the principal and interest accruing upon said bonds, together with all other moneys in the treasury not otherwise appropriated, or so much thereof as may be necessary."

Respondent claims that if the act provided for an appropriation to pay the bonds and coupons therein referred to, which is denied, then, it having been shown

that there has been at all times since the maturity of
the coupons in suit, in the general fund, sufficient money
with which to pay these coupons, the action is barred
by the statute of limitations. But the court found that
"from 1862 to 1889, both inclusive, there was not in
any year any surplus in the general fund in the state
treasury in excess of appropriations for current ex-
penses, and special appropriations for particular pur-
poses for that year," and we know from the public
records that in every year, except 1889, since the obli-
gations in suit matured, there has been levied upon the
property of the state an amount equal to, and specifically
appropriated by the legislature for, the expenses of the
state during the fiscal year for which the tax was levied.
There has never been, prior to the year 1890, any money
in the state treasury which had not been appropriated
by the legislature to some specific purpose for the sup-
port of the state government prior to the time of its re-
ceipt by the state treasurer. The findings show that in
1890, for the first time, a surplus of about five hundred
thousand dollars was received into the state treasury.
Prior to that time the petitioner never could have main-
tained a mandate for the payment of his coupons, and
this being so, of course the statute of limitations is no
bar to the proceeding. The words of the act, "not
otherwise appropriated," cannot be taken to mean "not
heretofore otherwise appropriated."

The bonds were not to mature until the expiration of
ten years, or at the option of the state after five years.
It was intended that the obligations provided for by the
act should be payable out of any money which should
at their maturity or thereafter be found in the state
treasury, and which at the time it reached the treas-
ury had not been appropriated to some other purpose.
(*Humbert* v. *Dunn*, 84 Cal. 57.) Sufficient funds must
be reserved to defray the expenses of the government—
the ordinary expenses of the legislative, executive, and
judicial departments of the state. Respondent claims
that interest is one of the expenses of the state as much

as salaries of the judges, the governor, and other state officers, and cites in support of the proposition *In re Appropriation by General Assembly*, 13 Col. 316; but the constitution of that state, in providing for the necessary appropriations to defray the expenses of the executive, legislative, and judicial departments of the state government for each fiscal year, expressly includes "interest on any valid public debt," and the case cited is authority in support of the proposition that the appropriations to defray the expenses of the government, for a particular fiscal year, are entitled to preference over any other appropriations from the general public revenue of the state, without reference to the dates of their passage.   It is a general rule that when payment is provided for out of a particular fund, or in a particular way, the debtor cannot plead the statute of limitations without showing that the particular fund has been provided, or the method pursued.   (1 Wood on Limitations, 2d ed., p. 363; *County of Lincoln* v. *Luning*, 133 U. S. 529; *Underhill* v. *Sonora*, 17 Cal. 172; *Freehill* v. *Chamberlain*, 65 Cal. 603.)   No provision was made by the state for the payment of these bonds until the year 1889, and we are of the opinion, therefore, that the statute did not begin to run against the bonds or coupons until that time.   If the petitioner had presented his coupons for payment prior to that time, his demand would have been refused on the ground that there were no funds.   He could not sue the state, because there never was any act authorizing him to sue.   "His remedy—if remedy it may be called—still lay in the voluntary exercise of the taxing power of the state.   In other words, the state, by reason of her sovereignty, still held control of the question of payment as to all its incidents of time, mode, and measure."   (*Sharp* v. *Contra Costa County*, 34 Cal. 284; *Rose* v. *Estudillo*, 39 Cal. 270, 275; *People* v. *Miles*, 56 Cal. 401.)

It is contended by appellant that his bonds and coupons bear interest from the time of their maturity until payment; but section 1917 of the Civil Code, cited, does

not apply to an indebtedness of the state, and the state is not liable to pay interest on its debts, unless its consent to do so has been manifested by an act of its legislature, or some lawful contract of its executive officers. (*United States* v. *North Carolina*, 136 U. S. 211; *Carr* v. *State*, 127 Ind. 204; 22 Am. St. Rep. 624.)   In *mandamus* the controller can be required to draw his warrant only for what is expressly authorized by the statute.   (*Auditorial Board* v. *Arles*, 15 Tex. 72; *Davis* v. *Porter*, 66 Cal. 658.)   *Davis* v. *County of Yuba*, 75 Cal. 452, was an action brought to recover the sum of five thousand six hundred dollars and interest—it was not a case of mandate.

The appropriation made by the act of 1851 was not repealed by the act of 1852, as claimed by respondent.   The latter act expressly provides that "the repeal in no wise affects the war loan bonds already issued under the provisions of the act so repealed."

In view of what has been said, it is unnecessary to consider the contention of the respondent that the act of 1852 is unconstitutional because it created a debt or liability against the state exceeding the limit provided for in article VIII, constitution of 1849, and it is not claimed that the act of 1851 is unconstitutional on that or any other ground.

We think that petitioner is entitled to a warrant for payment of the coupons issued under the act of 1851, but is not entitled to a warrant for the payment of bond No. 420, or any of the coupons in suit issued under the act of 1852.

The judgment is reversed, with directions to the court below to issue a peremptory writ of mandate to respondent, commanding him to draw his warrant upon the state treasurer, payable out of the general fund, in favor of petitioner, for the sum of eighteen hundred dollars, and to further adjudge that petitioner herein recover from the defendant the costs of this proceeding.

McFARLAND, J., FITZGERALD, J., and GAROUTTE, J., concurred.

We dissent from the judgment because in our opinion the only appropriation made by the act of February 15, 1851, for the payment of the bonds issued thereunder was such money not otherwise appropriated as might be in the state treasury at the date of the maturity of such bonds. Upon all the other points which it discusses we fully concur in the foregoing opinion of Mr. Justice Paterson.

DE HAVEN, J., HARRISON, J.

Rehearing denied.